THE NATIONAL BANK OF COMMERCE OF SEATTLE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56324.   Filed February 8, 1957.

*R. A. Moen, Esq.*, for the petitioner.
*John H. Welch, Esq.*, for the respondent.

#### OPINION.

ATKINS, *Judge:* The respondent determined a deficiency in the petitioner's income tax for the calendar year 1950 in the amount of $12,581.13, of which amount $3,506.90 is in dispute.   The question presented is whether, in computing the petitioner's excess profits credit based on income, the income experience of 4 banks whose assets were acquired by the petitioner in 1948 and early 1950 should be taken into account.   The facts were stipulated and are incorporated herein by this reference.

The petitioner is a corporation, organized under and existing by virtue of the laws of the United States, with its principal place of business in Seattle, Washington.   It filed its Federal income tax return for the taxable year 1950 with the collector of internal revenue for the district of Washington at Tacoma.

The petitioner acquired substantially all the properties of 4 State-chartered banks prior to December 1, 1950.

On May 29, 1948, it acquired the following properties of Pioneer State Bank, Goldendale, Washington:

| | |
|---|---:|
| Loans and discounts | $1,046,023.90 |
| United States bonds | 479,128.12 |
| Municipal bonds and warrants | 765.75 |
| Accrued interest and prepaid expense | 13,001.44 |
| Real estate, buildings, furniture, and equipment | 70,000.00 |
| Cash and cash items | 1,713,558.04 |
| Goodwill | 75,000.00 |
| Total | $3,397,477.25 |
| Less unearned interest and miscellaneous liabilities | 3,646.23 |
| | $3,393,831.02 |

In consideration for the acquisition of these properties, the petitioner assumed deposit liabilities of the Pioneer State Bank totaling $3,318,831.02 and also paid cash of $75,000. The Pioneer State Bank retained properties valued at $422,451.04 itemized as follows:

| | |
|---|---:|
| Loans and discounts | $13,416.71 |
| United States bonds | 15,000.00 |
| United States savings bonds | 130,300.00 |
| Municipal bonds | 27,194.87 |
| Miscellaneous | 944.10 |
| Cash | 235,595.36 |
| | $422,451.04 |

On July 8, 1948, the petitioner acquired the following properties of Almira State Bank, Almira, Washington:

| | |
|---|---:|
| Loans and discounts | $126,754.60 |
| United States bonds | 1,038,643.19 |
| Municipal bonds and warrants | 2,842.25 |
| Accrued interest and prepaid expense | 5,301.07 |
| Real estate, building, fixtures, and equipment | 18,000.00 |
| Cash and cash items | 713,608.85 |
| Total | $1,905,149.96 |
| Less unearned interest and miscellaneous liabilities | 168.02 |
| | $1,904,981.94 |

In consideration for the acquisition of these properties, petitioner assumed deposit liabilities of the Almira State Bank totaling $1,904,981.94. The Almira State Bank retained properties valued at $109,357.42 itemized as follows:

| | |
|---|---:|
| Loans and discounts | $2,283.45 |
| United States bonds | 82,600.00 |
| Municipal bonds | 3,000.00 |
| Miscellaneous | 1,900.00 |
| Cash | 19,573.97 |
| | $109,357.42 |

On February 11, 1950, the petitioner acquired the following properties of the Bank of Auburn, Washington:

| | |
|---|---:|
| Loans and discounts | $317,925.13 |
| United States bonds | 262,398.18 |
| Accrued interest and prepaid expense | 1,436.61 |
| Real estate, building, fixtures, and equipment | 13,693.50 |
| Cash and cash items | 496,949.40 |
| Goodwill | 21,575.93 |
| Total | $1,113,978.75 |
| Less unearned interest and miscellaneous liabilities | 2,026.79 |
| | **$1,111,951.96** |

In consideration for the acquisition of these properties, petitioner assumed deposit liabilities of the Bank of Auburn totaling $1,017,286.97 and also paid cash of $94,664.99.

On January 28, 1950, the petitioner acquired the following properties of Quincy Valley State Bank, Quincy, Washington:

| | |
|---|---:|
| Loans and discounts | $226,612.46 |
| United States bonds | 237,627.21 |
| Municipal bonds and warrants | 5,332.30 |
| Accrued interest and prepaid expense | 2,081.33 |
| Real estate, buildings, furniture, and equipment | 17,000.00 |
| Cash and cash items | 303,612.00 |
| Goodwill | 12,952.93 |
| | $805,218.23 |

In consideration for the acquisition of these properties, petitioner assumed deposit liabilities totaling $718,529.73 and also paid cash of $86,688.50.

No stock or securities were issued by the petitioner at the time of the acquisition of any of the foregoing properties.

After the acquisition by the petitioner of the properties and banking business of each of the 4 State banks, none of the 4 State banking corporations continued any business activities other than those incident to its complete liquidation, and within a reasonable time after ceasing business activities each completely liquidated in a transaction other than a transaction described in section 461 of the Internal Revenue Code of 1939, and each ceased its existence.

The properties of the 4 State banks acquired by the petitioner were substantially all of the properties which were used or which in the ordinary course of business replaced properties used by each of the 4 State banks in the production by each of excess profits net income for the period January 1, 1946, to the date of each of the 4 respective acquisitions.

Each of the 4 banking businesses so acquired (including the properties so acquired or properties in replacement thereof) was operated by petitioner from the date of each respective acquisition to the end of the taxable year December 31, 1950.

The deposit liabilities of each of the 4 State banks so assumed by the petitioner have not decreased but instead the deposit liabilities each have increased since the date of the acquisitions through the taxable year 1950.

The following is a comparison of deposit liabilities assumed by the petitioner in acquisition of the 4 banks with its average deposit liabilities after such acquisitions and to December 31, 1950:

| | Deposit liabilities originally assumed by petitioner | Average deposit liabilities after acquisition by petitioner | | |
| --- | --- | --- | --- | --- |
| | | 1948 | 1949 | 1950 |
| Goldendale branch (formerly Pioneer State Bank) acquired May 29, 1948 | $3,318,831 | $4,057,804 | $3,761,247 | $3,753,930 |
| Almira branch (formerly Almira State Bank) acquired July 8, 1948 | 1,904,981 | 2,161,357 | 2,458,080 | 2,566,893 |
| Auburn branch (formerly Bank of Auburn) acquired February 11, 1950 | 1,017,286 | ----------- | ----------- | 1,276,809 |
| Quincy branch (formerly Quincy Valley State Bank) acquired January 28, 1950 | 718,529 | ----------- | ----------- | 882,177 |

The base period excess profits net income (or deficit) of each of the 4 State banks for the period January 1, 1946, to the respective dates of the acquisitions of their properties by the petitioner was as follows:

| | 1946 | 1947 | 1948 | 1949 |
| --- | --- | --- | --- | --- |
| Pioneer State Bank | $24,782.22 | $27,971.11 | $25,125.57 | ----------- |
| Almira State Bank | 2,771.76 | 4,711.06 | 9,585.77 | ----------- |
| Bank of Auburn | 10,580.51 | 17,307.52 | 4,120.91 | ($16,026.17) |
| Quincy Valley State Bank | ----------- | 677.38 | 5,728.28 | 2,551.16 |

In the notice of deficiency the respondent denied the petitioner the claimed benefit of the earnings experience of the 4 State banks for the following stated reason:

It is held that, since none of the properties of the branches were acquired through a bona fide long-term increase in your capital structure made in conjunction with and for the purpose of such acquisition, the adjustments required under the rules prescribed by regulations under section 474 (f) of the Code have the effect of requiring the exclusion of the four branches' entire experience for each month of the base period prior to the respective dates of your acquisition of their properties. Your tax has accordingly been computed without the application of section 474 of the Code inasmuch as the application of such section would not result in a lesser tax liability.

Section 474, which comprises part IV of chapter 1, subchapter D of the Internal Revenue Code of 1939, was enacted by section 521 (a) of the Revenue Act of 1951. It is a relief provision for the computation of excess profits credit based on income in the case of certain taxable acquisitions of property by a corporation after December 31, 1945, and before December 1, 1950, and is applicable to taxable years ending after June 30, 1950. It provides in part as follows:

SEC. 474. EXCESS PROFITS CREDIT BASED ON INCOME—CERTAIN TAXABLE ACQUISITIONS.

(a) DEFINITIONS.—For the purpose of this part—

(1) PURCHASING CORPORATION.—The term "purchasing corporation" means a corporation which, before December 1, 1950, acquired—

(A) In a transaction other than a transaction described in section 461 (a), substantially all of the properties (other than cash) of another corporation, of a partnership, or of a business owned by a sole proprietorship; or

\*      \*      \*      \*      \*      \*      \*

(2) SELLING CORPORATION.—The term "selling corporation" means a corporation, a partnership, or a business owned by a sole proprietorship, as the case may be, properties of which were acquired by a purchasing corporation in a transaction described in paragraph (1).

(3) PART IV TRANSACTION.—The term "part IV transaction" means a transaction described in paragraph (1).

(b) AVERAGE BASE PERIOD NET INCOME OF PURCHASING CORPORATION.—The average base period net income of a purchasing corporation, if computed with reference to this part, shall be determined under section 435 (d). The average base period net income under section 435 (d) of a purchasing corporation shall be determined by computing its excess profits net income either with or without reference to this part, whichever produces the lesser tax under this subchapter for the taxable year for which the tax is being computed. If computed with reference to this part, the excess profits net income of a purchasing corporation for any month of its base period shall be its excess profits net income (or deficit therein), computed without reference to this part, and increased or decreased, as the case may be, by the addition or reduction resulting from including—

(1) In the case of a transaction described in subsection (a) (1) (A), the excess profits net income (or deficit therein) for such month of the selling corporation, * * *

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) LIMITATIONS.—This part shall apply only if each of the following conditions is satisfied:

(1) The selling corporation (A) did not, after the part IV transaction * * * continue any business activities other than those incident to its complete liquidation, and (B) within a reasonable time after ceasing business activities, completely liquidated in a transaction other than a transaction described in section 461 (a), and ceased existence.

(2) During so much of the base period of the purchasing corporation and of the period thereafter as preceded the part IV transaction, the properties acquired in the part IV transaction were substantially all of the properties (other than cash) which were used, or which in the ordinary course of business replaced properties used, by the selling corporation * * * in the production of the excess profits net income (or deficit therein) which under subsection (b) increases or decreases the excess profits net income of the purchasing corporation. * * *

(3) The business or businesses acquired in the part IV transaction (including the properties so acquired or properties in replacement thereof) were operated by the purchasing corporation from the date of such transaction to the end of the taxable year * * *

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(f) REGULATIONS.—The Secretary shall by regulations prescribe rules for the application of this part. Such regulations shall include the following rules:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(4) DUPLICATION.—Rules for the application under this part of the principles of section 462 (j) (1) and the other provisions of part II relating to the prevention of duplication.

The parties have stipulated that the petitioner acquired substantially all the assets of the 4 State banks and there is therefore no question that each of the transactions in question is a "part IV transaction" under section 474 (a). Furthermore, all the conditions set forth in section 474 (c) are satisfied, the parties having stipulated that the

State banks did not continue any business activities other than those incident to complete liquidation, and within a reasonable time they were completely liquidated; that the properties acquired by the petitioner were substantially all the properties (other than cash) which were used, or which in the ordinary course of business replaced properties used, by the State banks in the production of their excess profits net incomes (or deficits therein); and that the businesses and properties acquired were operated by the petitioner from the dates of acquisition to the end of the taxable year. However, the respondent contends that the petitioner may not take into consideration the excess profits net income of the selling corporations in computing its average base period net income, because he claims that to do so would result in a duplication in base period income contrary to the intent of the statute and the regulations promulgated thereunder. Pertinent provisions of section 40.474–4 of Regulations 130, as amended by T. D. 5998, 1953–1 C. B. 372, promulgated pursuant to section 474 (f), are set forth in the margin.[1]

---

[1] SEC. 40.474–4. RULES FOR THE PREVENTION OF DUPLICATION—(a) *In general.*—(1) The purpose of the rules prescribed in this section is to prevent certain duplications in base period income in cases where after December 31, 1945, and before December 1, 1950, *assets of a purchasing corporation are used to purchase properties of a selling corporation in a part IV transaction.* See section 474 (f) (4). In such cases the excess profits net income of the selling corporation, or portion thereof attributable to the properties acquired by the purchasing corporation, shall be excluded in determining the purchasing corporation's excess profits net income or deficit and its average base period net income with reference to the recomputations provided under part IV. The adjustment required under this section shall be made in the cases described in this section and in all other cases in which a similar adjustment may be required to prevent duplication, in a manner consistent with principles underlying such described cases. [Emphasis supplied.]

(2) Except to the extent that duplication of experience occurs, no adjustment is necessary under this section—

(i) Where stock of the purchasing corporation is issued directly to the selling corporation in exchange for properties of the selling corporation; or

(ii) Where properties of the selling corporation are acquired through a bona fide long-term increase in the capital structure of the purchasing corporation made in conjunction with and for the purpose of such acquisition. A bona fide long-term increase in the capital structure within the meaning of this subparagraph (whether an increase in equity capital or in borrowed capital as defined in section 439 (b)) shall be deemed to have occurred only to the extent that such increase is reflected in the capital structure throughout the period beginning with the time such increase is originally made and ending with the close of the taxable year of the purchasing corporation for which the tax is computed. * * *

(3) If properties of the selling corporation are acquired partly in the manner described in subparagraph (2) and partly in another manner the adjustment required under this section shall be made to the extent the acquisition is made in such other manner. See paragraph (c) below. * * *

(b) *Examples.*—The application of this section may be illustrated by the following examples:

*Example* (1).—The P Corporation and the S Corporation commenced business before January 1, 1946, and make their income tax returns on the calendar year basis. The P Corporation sold certain assets for cash and on July 1, 1950, it used such cash to purchase properties of the S Corporation in a part IV transaction. In applying section 474 (b) in determining the average base period net income of the P Corporation, the rule provided in paragraph (a) (1) of this section requires the exclusion of the S Corporation's entire experience for the base period. * * *

*Example* (2).—The S Corporation commenced business before January 1, 1946, and makes its income tax returns on the calendar year basis. The P Corporation was organ-

Specifically the respondent contends that under the regulations the income experience of a selling corporation may be used by the purchasing corporation only where properties of the selling corporation are acquired through an issuance of stock to the selling corporation or through a bona fide long-term increase in the capital structure of the purchasing corporation made in conjunction with and for the purpose of such acquisition. He states that the assumption by the petitioner of the deposit liabilities of the 4 State banks did not constitute a bona fide long-term increase in the capital structure of the petitioner.

In the first place we do not think that the regulations purport to cover specifically every situation which may arise under part IV of section 474. Certainly they do not specifically cover the precise situation here presented. Congress was careful to provide against a duplication of base period experience in the computation of the excess profits credit by imposing the limitations contained in section 474 (c), and by authorizing in section 474 (f) the promulgation of regulations which should contain rules relating to the prevention of duplication. The purpose of these provisions, as we read them, was not to deny a credit based on income attributable to all assets in existence during the base period, but to prevent a duplication of credit which would occur if a purchasing corporation parted with some of its assets, which had already been used in producing its own excess profits credit in the base period, in the acquisition of assets of a selling corporation and then claimed a credit made up of the earnings attrib-

___

ized on December 10, 1948. On January 1, 1949, the P Corporation issued its stock for cash and on the same day used such cash to acquire all the properties of the S Corporation in a part IV transaction. In determining the P Corporation's average base period net income under section 435 (d), based on a recomputation of its excess profits net income under section 474 (b), this section does not require the elimination of any part of the excess profits net income (or deficit) of the S Corporation. See paragraph (a) (2) of this section. * * *

   *        *        *        *        *        *        *

(c) *Acquisition resulting in partial duplication.*—If a purchasing corporation acquires properties of a selling corporation in a part IV transaction, and only a part of the total consideration transferred by the purchasing corporation consists of stock issued directly by the purchasing corporation or of cash or other assets acquired by the purchasing corporation through a bona fide long-term increase in its capital structure, only that part of the selling corporation's base period experience before the acquisition which is not attributable to such stock so issued or to such cash or assets so acquired is to be excluded in computing the purchasing corporation's average base period net income under section 435 (d), based on a recomputation of excess profits net income under section 474 (b). The portion of the selling corporation's experience not to be excluded under this section with respect to any part of the base period (and of the additional period through March 31, 1950, for the purpose of the substitute period provided in section 435 (d)) prior to the day of the transaction is an amount which bears the same ratio to the whole of the selling corporation's experience for such part of such period (or, in the case of a transaction described in section 474 (a) (1) (B), the part of the selling corporation's experience properly attributable to the properties acquired by the purchasing corporation), as the sum of the fair market value of the stock of the purchasing corporation issued directly to the selling corporation, plus the fair market value of the other assets or cash acquired in the manner described in paragraph (a) (2) of this section, bears to the fair market value of the total consideration received by the selling corporation for such properties. * * *

utable to all of its assets, plus those acquired from the selling corporation. Indeed, the italicized portion of the regulations and the examples set forth therein recognize this. We think this is what the Senate Finance Committee had in mind in stating in its report in connection with section 474 that a purchasing corporation is to be permitted the use of the earnings experience base of the selling corporation only to the extent new funds are used for the purchase of the assets.[2]

Here, after the acquisition of the properties of the 4 State banks, and during the taxable year 1950, the petitioner had assets greatly in excess of the assets it previously had which had contributed to its own base period experience. There was here no mere substitution of its own assets for assets of the selling corporations, except to the extent of the cash paid out in three instances in partial consideration for the acquisitions. The respondent in effect contends that the assumption by the petitioner of the deposit liabilities of the selling corporations is tantamount to the payment thereof, by use of the petitioner's assets, in order to acquire the properties of the selling corporations, citing Rev. Rul. 163, 1956-1, C. B. 658. We are unable to agree with such conclusion. Actually the deposit liabilities were not paid off by use of the petitioner's assets. The evidence shows that there was no decrease in the average deposit liabilities of these State banks (subsequently operated as branches of the petitioner) from the date of the acquisition of the assets through the taxable year in question. We recognize, of course, that in the nature of the banking business there may be constant withdrawals of deposits and receipts of new deposits, but we think that in the normal course of business any payments of deposit liabilities by the petitioner would be made from deposits or other current funds, rather than out of assets which had contributed to its own base period experience.

If the petitioner had borrowed money by the issuance of bonds or debentures and had used the funds to purchase the assets of the selling

---

[2] S. Rept. No. 781, 82d Cong., 1st Sess. (1951-2 C. B. 458, 511), provides in part as follows:

Part II of the Excess Profits Tax Act of 1950 provides rules under which an acquiring corporation may utilize the earnings experience of a predecessor corporation in computing its own average earnings base. However, under the Excess Profits Tax Act of 1950, the acquiring corporation may use this earnings experience only where the assets of the predecessor corporation were acquired in certain tax-free exchanges. In general, these tax-free exchanges occur where the assets of a predecessor corporation are acquired by the acquiring corporation in exchange for its stock. Under the present law the earnings experience of a predecessor corporation may not be used by an acquiring corporation where the assets were acquired by purchase for cash or in some other type of taxable exchange. * * *

Your committee believes that, in the case of taxable exchanges, subject to certain limitations, where purchasing corporations have obtained substantially all of the assets of a predecessor corporation and such predecessor is liquidated, the earnings experience base of the predecessor corporation should be available to the purchasing corporation. * * * However, it is to be permitted the use of this base only to the extent that new funds were used for the purchase of these assets. * * *

corporations, apparently there would be no question as to its right to use the income experience of the selling corporations in computing its excess profits credit, except to the extent that some duplication might occur in some other manner, as, for example, by reason of an increase in the excess profits credit on account of a capital addition under section 435. This is contemplated by section 40.474–4 of the regulations where it is provided that no adjustment is necessary where properties are acquired through a bona fide long-term increase in the capital structure of the purchasing corporation, except to the extent that duplication may occur. We see no reason why the same result should not follow where the increase in indebtedness results from an assumption of liability to depositors. In either case the purchasing corporation has incurred an indebtedness in connection with the acquisition of assets, and without parting with any of its own assets which have contributed to its own base period income experience.

In the instant situation there would be no duplication by reason of a capital addition under section 435 since the depositor liability assumed by the petitioner would not constitute borrowed capital under the definition contained in section 439 (b). Nor would there be any other duplication, except to the extent of the earnings experience of the assets acquired by the petitioner for cash. There is no showing that the cash used by the petitioner in three of the acquisitions had not contributed to its own base period earnings experience.

We conclude that the petitioner is entitled to include, in computing its average base period net income, that portion of the excess profits net income (or deficit therein), for each month, of the selling corporations which is properly attributable to the portion of the assets acquired by the petitioner in consideration of its assumption of the deposit liabilities. The amount to be excluded in such computation because of the payment by the petitioner of cash as a part of the consideration for the assets in three of the acquisitions will be determined in connection with the recomputation under Rule 50.

Reviewed by the Court.

*Decision will be entered under Rule 50.*